IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 15, 2006

## STATE OF TENNESSEE v. RICKY L. TRENTHAM, JR.

**Direct Appeal from the Criminal Court for Greene County**
**No. 04-CR-070    James E. Beckner, Judge**

—————————

**No. E2005-01443-CCA-R3-CD - Filed October 2, 2006**

—————————

The defendant, Ricky Lee Trentham, Jr., was convicted of simple possession of marijuana, Tenn Code Ann. § 39-17-418(a), a Class A misdemeanor, and sentenced to eleven months, twenty-nine days at 75%. On appeal, he raises three issues for our review: (1) whether the evidence was sufficient to support the conviction; (2) whether a copy of High Times magazine was erroneously admitted into evidence; and (3) whether he was properly sentenced. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., and J.S. DANIEL, SR. J., joined.

John S. Anderson, Rogersville, Tennessee, for the appellant, Ricky L. Trentham, Jr.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; C. Berkeley Bell, Jr., District Attorney General; and Eric D. Christiansen, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

Agent Tim Ward of the Third Judicial District Drug Task Force executed a search warrant on November 14, 2003, at 325 Pine Street in Greeneville, which resulted in the defendant's indictment for possession of marijuana with the intent to deliver and subsequent conviction for the lesser-included offense of simple possession of marijuana.

Agent Ward was the State's first witness at trial. Ward summarized his qualifications, stating that he had been on the drug task force since 1996, attended "multiple undercover schools" where he learned how to work with informants, prepare and execute search warrants, as well as recognize

different types of narcotics, and participated in the preparation and execution "of well over a hundred and fifty search warrants." Ward said he obtained the search warrant in this case after conducting a controlled buy at the house with a confidential informant. He said that he and Officer Shane Matthews served the warrant on Derrick Aiken, a resident of the house, and that Officer Mike Crum joined them just after they entered the house. He said that Aiken later pled guilty to marijuana charges resulting from evidence recovered in Aiken's bedroom.

Ward said that there was "stuff everywhere" in the "back bedroom."[1] Specifically, he said that it contained a single bed, chest-of-drawers, clothing, a couple of dollars in change, and personal papers bearing the defendant's name. One of the papers was a letter addressed to "Ricky," and another was a contract for cellular telephone service in the defendant's name, dated September 14, 2003. Comparing the contract to one of two cellular telephones[2] he found in the house, to confirm that the telephone's number was the number listed on the defendant's contract, Ward turned the phone on and testified the phone read, "Ricky. 620-2392. And it says Ricky." Ward testified that, in his opinion, the defendant "occupied the back bedroom," where the officers found "baggies, other paraphernalia that is commonly associated with marijuana use and sales and four plastic bags containing . . . what [they] believed to be marijuana, approximate weight, bags and all, about a pound of marijuana." They found the four bags of what appeared to be marijuana inside the dresser and found a metal tray containing marijuana debris on top of the dresser. Ward explained that "this type of tray, this type of thing, is used when you're breaking down a large amount of marijuana into smaller amounts so it can be re-sold." The officers also discovered "a marijuana pipe or a pipe of the type used to smoke marijuana," two larger empty bags that he determined had contained marijuana by smelling them, an "open sandwich baggy box containing a few sandwich baggies," and a box of Phillies Blunts cigars in the same area. As to the bags and baggies, Ward said, "In my experience I've found that marijuana contained in large bags, large amounts, is then broken down and sold in smaller bags," and that the bags found in the back bedroom were the kind "commonly used to bag marijuana to be sold." Concerning the cigars, he explained it was a "fairly common practice to take a pre-made cigar, slit it, and take the tobacco out or most of the tobacco out, and refill it with marijuana. And they can be smoked or sold."

Over defense counsel's objection, a copy of High Times magazine found in the back bedroom was then admitted, and Ward compared an advertisement for Treetop Glass pipes in the magazine with the pipe found in the back bedroom and said they were "similar."

On cross-examination, Ward acknowledged that he did not take any photographs of the back bedroom as a whole but said photographs were taken of other rooms in the house. He could not remember exactly where the cellular telephone had been found but thought it had been found in the back bedroom or the den. Ward said that Aiken was not charged with possession of the marijuana

---

[1]As whether the defendant lived in this bedroom was a disputed factual issue at trial, we have set out in some detail the testimony on that issue and to distinguish this room from other rooms in the house, we will refer to this room as the "back bedroom."

[2] Ward said the other telephone was identified as Aiken's.

found in the back bedroom because of the layout of the house and the fact that they found a substantial amount of marijuana in Aiken's own bedroom.

Officer Shane Matthews of the Greeneville Police Department testified that he assisted Agent Ward with the execution of the search warrant and found four bags of marijuana in the top drawer of the dresser in the back bedroom.

Officer Mike Crum testified that he participated in the execution of the search warrant and prepared the evidence log on which he made the notation, "Derrick and Ricky," beside the entry regarding the two cellular telephones found at the house. Officer Crum was then asked to turn on the black telephone which caused the number to scroll across the screen of the telephone. Officer Crum said that "on the screen that stays on, it's got the name Ricky as Ricky's phone."

Special Agent Carl Smith, a forensic scientist with the Tennessee Bureau of Investigation's Knoxville Crime Laboratory, testified that his analysis of the multiple bags of plant material he received in the defendant's case revealed 382.1 grams of marijuana. On cross-examination, he acknowledged that the tests he conducted were to identify the substance as marijuana and that he had not conducted any testing to determine who had been in possession of the marijuana.

The defendant's first witness was Derrick Aiken. As to the living arrangements at the house at the time of the search, he said he was "pretty much just staying there [b]y [him]self. Just paying rent." He confirmed that the defendant's name was still on the lease at the time but said the defendant only came to the house occasionally because he was living with his girlfriend. He said that the marijuana found in the house belonged to him and denied that any of it belonged to the defendant. Asked if the defendant had "anything to do with the baggies or anything else," Aiken said, "No. It was all mine."

On cross-examination, Aiken acknowledged that, as a result of the search, he pled guilty to possession of 957 grams of marijuana with the intent to deliver. He admitted that he had been charged with burglary and had pled guilty to theft under $500 in June 2000. Regarding where the defendant's telephone was found, he said, "If I recall it right, that was sitting on the outside porch on a freezer we had on the porch." Aiken acknowledged that he sold the marijuana during the controlled buy Agent Ward made shortly before the search but denied he was in the business of selling marijuana. Asked if he planned to smoke the 957 grams of marijuana himself, Aiken said, "Majority, yeah." He said he could not recall what he told Agent Ward when Ward asked him if the defendant lived at the house with him.

The defendant's girlfriend, Kristen Cobble, testified that in the fall of 2003 the defendant lived with her in Mosheim. She acknowledged that the defendant kept some personal items at 325 Pine Street, saying, "It's just like his bed and dressers and stuff because they weren't – we don't have no room for it in my house. I already have all that stuff." Asked about the defendant's telephone, Cobble said, "I knew he left his phone there because he went by there that day to get his motorcycle permit or something, I don't know, because I called and he said he didn't have the phone when he

come by [sic]." Regarding the defendant's clothing, she stated, "Some of his clothes were there but it was like old clothes. It wasn't nothing [sic] he wears."

The defendant testified that his oldest brother owned the house on Pine Street. As for whether he had ever lived at that house, the defendant said he "never really lived there. When my two brothers swapped houses over family matters . . . I moved my stuff out of the house that was down in Mosheim and moved it with my brother's stuff to the other house. But the whole time, I was staying at her house." He said he had "two old dressers, a mattress and box spring, and like some old clothes from high school" in the back bedroom of the house on Pine Street. The defendant said that Aiken paid the rent but acknowledged that the utilities were in his name. He said he left his telephone on top of a refrigerator on the porch when he went to the house to get his "motorcycle title out of the back bedroom in the top of the closet." He denied knowing that there was marijuana in the house or that it belonged to him. Asked if he saw the metal tray on top of the dresser when he went into the back bedroom, the defendant said, "No. I just walked in and got the title and left." He also denied seeing the box of cigars and said he did not own the High Times magazine or the pipe. He acknowledged that a print of a marijuana leaf on the wall in the back bedroom was his.

Recalled as a rebuttal witness by the State, Agent Ward testified that when he executed the search warrant, Aiken told him that the defendant also lived at the house.

## ANALYSIS

### I. Sufficiency of the Evidence

On appeal, the defendant argues that the evidence presented at trial was not sufficient to support his conviction. In consideration of this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also Tenn. R. App. P. 13(e); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). This rule applies when the determination of guilt is based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice

to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523 (Tenn. 1963)). Additionally, a jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

To argue the insufficiency of the evidence in the present appeal, the defendant points out that, at trial, he denied ever being in possession of marijuana, Aiken claimed that the marijuana was his, and that both Aiken and Cobble testified that the defendant did not live at 325 Pine Street. Taken in the light most favorable to the State, the proof showed that, in the back bedroom of the residence at 325 Pine Street, officers found a letter addressed to the defendant, a cellular telephone contract bearing his name, baggies and paraphernalia associated with marijuana use and sales, four baggies of marijuana, a marijuana pipe, as well as other evidence associated with illegal drugs. Additionally, a cell phone registered to the defendant, and bearing the same telephone number as on the contract, was found in the house, and Aiken told Agent Ward that the defendant was living at the Pine Street residence.

The defendant also argues the evidence was insufficient to support his conviction because there was no direct evidence linking him to the marijuana and "[i]t was never shown that he had control over the [m]arijuana." Although the defendant presented testimony that the back bedroom was not his, the jury credited the State's evidence in this regard. The jury determines "the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). Based upon the record, a reasonable jury could conclude that the back bedroom was that of the defendant and, thus, that the marijuana was his.

Additionally, the evidence was sufficient to show the defendant had control over the marijuana. To establish simple possession, the evidence must have shown that the defendant "knowingly possess[ed]" the marijuana. Tenn. Code Ann. § 39-17-418(a) (2003). In Tennessee, "'possession' may be either actual or constructive." State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001). To establish constructive possession,

it must appear that the person has the power and intention at any given time to exercise dominion and control over the drugs either directly or through others. State v. Williams, 623 S.W.2d 121, 125 (Tenn. Crim. App.1981). The mere presence of a person in an area where drugs are discovered is not, alone, sufficient to support a finding that the person possessed the drugs. [State v.] Cooper, 736 S.W.2d [125,]

129 [Tenn. Crim. App. 1987]. Likewise, mere association with a person who does in fact control the drugs or property where the drugs are discovered is insufficient to support a finding that the person possessed the drugs. State v. Transou, 928 S.W.2d 949, 956 (Tenn. Crim. App. 1996).

State v. Bigsby, 40 S.W.3d 87, 90 (Tenn. Crim. App. 2000). The evidence in this case, including the fact that the defendant admitted he owned the dresser in which the marijuana was found and kept personal belongings in the back bedroom, when considered in a light most favorable to the prosecution, supports the jury's finding that the defendant constructively possessed the marijuana.

## II. High Times Magazine

On appeal, the defendant argues that the trial court erred in admitting into evidence a copy of the magazine, High Times, which was found in the back bedroom. This matter arose at trial as Agent Ward was testifying about various items which were found in the back bedroom. He had just identified, and the court had allowed into evidence, a pipe, apparently used for smoking drugs. Ward identified an advertisement in High Times magazine for pipes manufactured by TreeTop Glass. Ward compared a pipe shown in the advertisement with the pipe found in the back bedroom and said they were "similar." The defendant objected to the introduction of the High Times magazine, saying that its prejudicial effect outweighed its probative value, but the trial court disagreed and allowed it into evidence. The admission of evidence generally lies within the sound discretion of the trial court and will not be reversed on appeal absent a showing of an abuse of discretion. See State v. Gilliland, 22 S.W.3d 266, 270 (Tenn. 2000). We conclude that the trial court did not abuse its discretion in allowing this evidence.

## III. Sentencing

The defendant further argues that the trial court erred in sentencing him to eleven months, twenty-nine days with a release eligibility date of 75%. Specifically, he argues that the trial court overlooked the fact "that the jury fixed the fine in the midrange and the youth of the [defendant]."

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003) (amended 2005). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). Our review of the record in the present case, as is set out below, reveals that the trial court properly considered all necessary sentencing considerations, so the presumption of correctness applies to the trial court's sentencing determinations.

At the sentencing hearing, the trial court detailed the defendant's extensive criminal record, which included convictions for several traffic violations, facilitation of attempted aggravated robbery, assault, simple possession of marijuana, evading arrest, and public intoxication, and applied

enhancement factor (2).  See Tenn. Code Ann. § 40-35-114(2) (2003) (amended 2005).[3]  The trial court also found that the defendant had committed the present offense while on probation for the previous simple possession and evading arrest convictions.  See Tenn. Code Ann. § 40-35-114(9) (2003) (amended 2005).  The court stated that these were "two very weighty enhancement factors that would, without any question, easily take and should take the punishment to the top of the range." The court also found one mitigating factor applicable, that the offense neither caused nor threatened serious bodily harm, see Tenn. Code Ann. § 40-35-113(1) (2003), but stated that it did not carry a lot of weight in a drug case.

Next, to determine how much of the defendant's sentence should be spent in confinement, the trial court examined the relevant statutes, Tenn. Code Ann. §§ 40-35-102–103 (2003) (amended 2005), and set his release eligibility date at 75%.  In addition to the statutory findings, the court further stated that probation and alternative sentencing

should be denied at this time because of the prior record, because of the prior probations and community corrections violations, because it shows a history of drug abuse and a history of alcohol abuse, and because from all the evidence in this case it would be clear that the defendant testified falsely under oath in this case.

On appeal, the defendant argues that the trial court ignored his youth as a mitigating factor. See Tenn. Code Ann. § 40-35-113(6) (2003).  However, this is incorrect.  In determining that the defendant's youth would not mitigate the length of his sentence, the trial court stated:

The defendant was . . . 22 years old when this occurred.  He had already been through the judicial system on many occasions, one involving an aggravated robbery for which he received a three year sentence and violated his community corrections.

So it would not seem that youth would be a real issue in the case.  [The defendant], by this time, was pretty experienced with the criminal justice system and with decisions that would cause one to avoid it or become involved within it.

The defendant's argument that the trial court ignored the fact that the jury set the defendant's fine in the mid-range is equally inaccurate because, before determining the length of his sentence, the court stated, "The jury has recommended a fine of one thousand two hundred and fifty dollars, and I do fix that to be the fine in this case."

The defendant's final contention, that the trial court's imposition of the sentence recommended by the State "shows a lack of consideration of the other sentencing factors," also has

---

[3]The defendant's crimes were committed, and his sentence imposed, prior to June 7, 2005.  As such, the 2003 codification of sentencing law is applicable in this case.  See 2005 Tenn. Pub. Acts, ch. 353, § 18.  However, we note that substantial changes came with the 2005 amendments, including re-numbering the list of enhancement factors.  See Tenn. Code Ann. § 40-35-114 (2005).

no merit because, as we have set out, the trial court thoroughly considered all relevant facets of sentencing law.

## **CONCLUSION**

For the foregoing reasons, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE